# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

MICHELLE SHOEMAKER,     )
                          )
      Petitioner,       )      Case No. 3:10-cv-1149
                          )      Chief Judge Haynes
v.                    )
                          )
JEWEL STEEL, Warden,     )
                          )
      Respondent.     )

## MEMORANDUM

Petitioner, Michelle Shoemaker, filed this pro se action under 28 U.S.C. § 2254 seeking the writ of habeas corpus to set aside her conviction for first-degree murder, conspiracy to commit first-degree murder, solicitation of first-degree murder and tampering with evidence. After review of the pro se petition, the Court appointed the Federal Public Defender to represent the Petitioner and an amended petition was filed on November 22, 2011. (Docket Entry No. 35). In her amended petition[1], Petitioner's claims are: (1) that the trial court denied Petitioner the right to present a defense by preventing her from eliciting testimony from a witness that there was a "contract" on Petitioner's life; (2) that Petitioner received ineffective assistance of counsel due to her trial counsel's failure to challenge the admissibility of Petitioner's fourth statement to law enforcement officers; and (3) that Petitioner's counsel was ineffective for advising Petitioner to reject a plea offer of 15 years. (Docket

---

[1] Rule 15 of the Federal Rules of Civil Procedure applies to a habeas proceeding. Mayle v. Felix, 545 U.S. 644, 649 (2005); Rule 6(a), Rules Governing Section 2254 Cases. Under Fed. R. Civ. P. 15 (a), the filing of an amended complaint supersedes the prior complaint. Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986). Thus, the Court deems the amended petition to supersede the pro se petition and the claims therein. Unless adopted and supported by legal memorandum, the Court deems the claims in the pro se petition to be waived.

Entry No. 35, Amended Petition at 16-23).

After a review of the record, the Court afforded the parties an opportunity to file additional memoranda on their respective claims and defenses. (Docket Entry No. 41). Respondent filed a brief (Docket Entry No. 48) and Petitioner sought an extension concerning her ineffective assistance of counsel claim that the Court granted. (Docket Entry Nos. 49 and 51).[2]

## A. Procedural History

A jury convicted Petitioner of first-degree murder, conspiracy to commit first-degree murder, solicitation of first-degree murder, and tampering with evidence. Petitioner received a life sentence for first-degree murder, 20 years sentence for conspiracy, and three years for tampering with evidence, all concurrent sentences. The state trial court merged Petitioner's solicitation conviction with the murder conviction. On appeal, the Tennessee Court of Criminal Appeals affirmed Petitioner's convictions and sentences. State v.Shoemaker, No. M2005-02652-CCA-R3-CD, 2006 WL 3095446 (Tenn. Ct. Crim. App., Nov. 2, 2006). On March 12, 2007, the Tennessee Supreme Court denied Petitioner's application for permission to appeal. Id. Petitioner did not seek review in the United States Supreme Court.

On February 22, 2008, Petitioner filed a state post-conviction petition and after an evidentiary hearing, the state trial court denied the petition. On April 13, 2010, the Tennessee Court of Criminal Appeals affirmed the order of dismissal. Shoemaker v. State, No. M2009-00472-CCA-R3-CD, 2010 WL 1462527 (Tenn. Crim. App., April 13, 2010). On August 25, 2010, the Supreme Court denied Petitioner's application for permission to appeal. Id.

---

[2] Petitioner did not file an additional brief by the deadline, but the Court concludes that Petitioner's ineffective assistance claim fails as a matter of law. If the Court has erred, Petitioner can move to reconsider.

## B. Review of the State Record

The Tennessee Court of Criminal Appeals set forth the extensive facts[3] underlying

Petitioner's convictions on Petitioner's direct appeal.

**The defendant's convictions arise from the murder of her stepfather, Jim Kerr. The evidence at trial established that four individuals-the defendant; the defendant's mother, Carol Kerr; the defendant's husband, Dean Shoemaker; and Robert Foutch a/k/a Glen "Frankie" Sanders,FN1 who lived with the defendant and her husband-conspired to kill Mr. Kerr and to share the life insurance proceeds that Mrs. Kerr anticipated she would receive following her husband's death. The evidence demonstrated that the actual killing was perpetrated by Dean Shoemaker and Robert Foutch.**

> FN1. The witnesses referred to this individual by both names. It appears that his actual name is Robert Foutch. Both names have been used in this opinion and are reflective of the name that each witness used for Foutch/Sanders when testifying about him.

Sergeant Michael Smith of the Gainesboro Police Department testified that he responded to the victim's home as a result of a 9-1-1 call. When he arrived, Sheriff Wayne Mahaney, Deputy Gary Griggs, Carol Kerr, and the defendant were present. The victim's body was on the ground under a tree. Sergeant Smith secured the scene and collected evidence. He said he also conducted interviews and collected evidence on other dates. He said the evidence he recovered included .32 caliber wadcutters ammunition that had been hidden inside a tree.

Doctor Thomas Deering testified that he performed an autopsy of the victim's body. He said that the victim's cause of death was a homicide and resulted from multiple gunshot wounds with blunt force trauma to the head as a contributing factor.

**Jessica Roethlisberger testified that the defendant used to work for her at Lakefront Market. Roethlisberger said she had loaned the defendant a .32 caliber Smith and Wesson gun in November or December 2001. The witness said that she had been subpoenaed to testify at an earlier setting of the defendant's trial but that she learned that the defendant "ran off."**

---

[3] State appellate court opinion findings can constitute factual findings in a habeas action. Sumner v. Mata, 449 U.S. 539, 546-47 (1981) and have a statutory presumption of correctness 28 U.S.C. § 2254(e).

Tracy Schenk testified that she was the human resources supervisor at Arvin Meritor in June 2002. She said that Carol Kerr was employed there and that Ms. Kerr had a $64,000 life insurance policy on her husband, James Kerr, through the company. Schenk said that Ms. Kerr was the beneficiary of the policy.

Russ Winkler, a Tennessee Bureau of Investigation (TBI) investigator, testified that he was called to the victim's residence on June 29, 2002. He assumed the role of case agent and oversaw the investigation and managed the case file. Investigator Winkler prepared a diagram of the scene, which he explained in detail to the jury. He said that he searched for evidence from the scene but that he did not recover any empty shell casings. He interviewed the defendant and Carol Kerr at the scene.

**Investigator Winkler read to the jury the first of several written statements he took from the defendant. In it, the defendant said that she had picked up her mother, Carol Kerr, at the Kerr residence at about eleven o'clock that morning. She saw the victim working on his truck.** She had her five children in her van, and the group went to McDonald's and Wal-Mart in Lafayette. **They went to the defendant's house, left the defendant's Wal-Mart purchases, and left the defendant's children with her husband. The defendant and Kerr then went to Bi-Lo in Cookeville, where Kerr bought groceries. They went to Kerr's home, and they found the fatally injured victim and called 9-1-1.**

Investigator Winkler testified that he and other authorities conducted their investigation for about two months before getting a "break" in the case. He conducted interviews of the defendant and her husband on September 3. **Winkler read the defendant's second written statement to the jury. In that statement, the defendant said she had known Glen "Frankie" Sanders since 1998 when she lived in Florida, just prior to moving to Tennessee. She said that when she and her mother came home from shopping on June 29, her husband, Dean Shoemaker, told them that Sanders had killed the victim. She said that Sanders confirmed that he had killed the victim, and then threatened that he "would kill us and the kids if we told anyone." The defendant said she thought Sanders had used a gun she had borrowed from Jessica Roethlisberger. She said that after Sanders threatened Kerr and her, they had gone to Bi-Lo, and she said that her first statement was accurate regarding what happened after that. The defendant said that she had gone with her husband and Sanders to dispose of evidence on July 4. She said that Sanders had her throw bullets and pieces of a box out the window as they drove down a highway and the interstate.** Sanders tossed a pipe over the side at a scenic view area, and he tossed a gun out as they drove across a bridge. The defendant said that she had spoken with her mother by telephone in August and that her mother had made a comment that "if Glen [Sanders] had done it right, she would have already had the [insurance] money." **The defendant said**

that she hoped she had not understood correctly. **The defendant said that later, she talked with her mother in person and that when the defendant expressed her concern about Sanders, her mother told her that she had nothing to worry about as long as her mother received the insurance money and Sanders was paid. She said her mother told her, "I had him do it; I've got to pay him."**

Investigator Winkler testified that he tape recorded a telephone call between Dean Shoemaker and the defendant. He played the tape for the jury. In the call, the defendant denied involvement in the murder of the victim. The defendant expressed her displeasure that Shoemaker had spoken with the authorities and requested that he discontinue conversations with them.

Investigator Winkler testified that as a result of the September 3 interviews, he went to the Shoemakers' barn the next day and recovered a fired bullet. He submitted the bullet to the TBI for testing.

**Investigator Winkler obtained a third written statement from the defendant on September 18 after Foutch had been arrested for the victim's murder.** In it, the defendant said that before the Kerrs had moved to Tennessee, Mrs. Kerr made comments that she hoped Mr. Kerr would get hurt at work. **The defendant said that when the Kerrs were first moving to Tennessee, Mr. Kerr was overdue to arrive and Mrs. Kerr seemed happy and was smiling when the defendant learned from the Georgia State Patrol that an individual had been killed in a wreck who was driving a vehicle similar to the victim's. The defendant also said that Mrs. Kerr had made statements about wanting Mr. Kerr to be run over by a tractor and that Mrs. Kerr had seemed unconcerned when Mr. Kerr had been seriously injured in a wreck. She described several reasons why Mrs. Kerr complained about Mr. Kerr.**

After the defendant was indicted and arrested, Investigator **Winkler obtained a fourth written statement from her. In this statement, the defendant said that Mrs. Kerr had been talking for a long time about wanting Mr. Kerr dead and that she would pay half of the life insurance proceeds to whomever would complete the crime. The defendant said that Mrs. Kerr had asked her to kill Mr. Kerr, but the defendant told her that she "could not personally do it." The defendant said that there had been several discussions among herself, Mrs. Kerr, the defendant's husband, and Sanders in the months preceding the victim's death about various methods by which the victim might be killed. The night before the crime, they decided that Dean Shoemaker and Sanders would go to the victim's house the following day to kill him while the defendant and Mrs. Kerr were at Wal-Mart. The defendant said that they all agreed that the killing needed to look like an accident. The defendant said that before she and Mrs. Kerr arrived at Wal-Mart on June 29, Dean Shoemaker called and told**

her "it was done," meaning the victim had been killed. She spoke with him again before she returned home, and Shoemaker told the defendant that there was a problem and she should hurry home. The defendant said that when she and Mrs. Kerr arrived at the defendant's home, Sanders was mad at Shoemaker. The defendant said that Sanders told them that he shot the victim and that Shoemaker had run to hide in the bushes while Sanders was killing the victim. The defendant said Shoemaker told her that he was afraid of Sanders. The defendant and Mrs. Kerr went to Bi-Lo to buy milk for the victim in order that it would look like Mrs. Kerr did not know that the victim was dead. The defendant said that after the killing, it was her idea to get rid of the ratchet and gun and that Sanders had never made threats. The defendant said that she had not told the truth in her prior statements because she was afraid of what would happen to her if she told the truth. She said that she "never thought they would really go through with it."

Investigator Winkler testified that he had been in court for a prior setting of the defendant's trial but that the defendant failed to appear. He said that a warrant was issued and she was arrested.

Investigator Winkler testified that Foutch had given conflicting statements about the level of his involvement in the murder. However, he said that Foutch said that the defendant had been present when some of the conversations about killing the victim had taken place.

Investigator Winkler testified that he tape recorded a telephone conversation between the defendant and Mrs. Kerr. The tape was played for the jury. In it, the defendant told Mrs. Kerr that the authorities knew "everything" and said that it would be best if Mrs. Kerr cooperated with them. Mrs. Kerr declined to do so on the tape.

**Investigator Winkler** testified that Dean Shoemaker pled guilty to second degree murder in exchange for a thirty-five year, Range II sentence. He **read Shoemaker's detailed, written plea agreement to the jury. In it, Shoemaker admitted that several discussions about killing the victim occurred before the crime took place. Shoemaker's plea agreement implicated the defendant as being involved in those discussions. Shoemaker also acknowledged in the plea agreement that on the day of the murder, the defendant asked Foutch if there was going to be an accident, and that Foutch said there was. Shoemaker said that he went to the victim's house to help him work on his truck and that he took Foutch with him. Shoemaker said that he began working on the truck and that Foutch started beating the victim with a ratchet. He said that Foutch pulled a gun, told him to get down, attempted to drop a jack on the victim, who was under the truck, and shot the victim several times. Shoemaker said Foutch said that "he wasn't going down alone," then forced Shoemaker to hold the gun pointed at the victim and**

that Foutch pulled the trigger. Shoemaker said, "Robert [Foutch] did tell me he saved one bullet for me." Shoemaker said that he called the defendant and told her that Foutch had killed the victim and that she and Mrs. Kerr came home but then left to go to Bi-Lo to buy something to help establish an alibi. He said that later that day, Foutch instructed the defendant to wipe down everything at the Kerr residence to remove Foutch's fingerprints. Shoemaker said that the defendant told him later that night that she and Mrs. Kerr had wiped down everything.** He said that Mrs. Kerr was angry at Foutch for not making the murder look like an accident and that Foutch was angry with Mrs. Kerr because she told him he was going to get paid less than she had originally promised him because the insurance policy was for less than she had thought. **He said that the defendant was angry with Mrs. Kerr because the defendant knew Mrs. Kerr was lying about the amount of the insurance policy. He said that around July 5, Mrs. Kerr and the defendant told him he needed to "keep [his] mouth shut" and say that he had been home all day on the day of the murder. Shoemaker said that a few days before the murder, the defendant had been outside firing the gun she had borrowed from Roethlisberger and that she gave the gun to Foutch that day. He said the defendant told him he should blame the crime on Foutch.**

Investigator Winkler testified that Robert Foutch had received a plea agreement in which he agreed to plead guilty in exchange for a sentence recommendation of life with the possibility of parole. **The facts included in Foutch's plea agreement stated** that Foutch had known the Shoemakers and the Kerrs since the time they all lived in Florida. Foutch said that after the Shoemakers moved to Tennessee, he was about to have his probation violated in Florida and came to Tennessee, using his cousin's name, Glen Sanders. He said that he first visited friends in Spring City and that he then came to live with the defendant and Dean Shoemaker. Foutch said that he heard Mrs. Kerr make disparaging remarks about Mr. Kerr to the defendant. He **said that the defendant and Dean Shoemaker had financial problems and that they told him they would receive half of the insurance proceeds if they killed Mr. Kerr and would give him a third of their share if he would do it for them. He said that the day before the murder, the defendant and Dean Shoemaker told him that the victim would be home alone the next day working on a truck. He testified that he and Shoemaker were going to go to the victim's house "to see if anything could be done" while the defendant and Mrs. Kerr were at Wal-Mart. He said they discussed that the death should look accidental. Foutch described the murder of the victim, and he admitted he had struck and shot the victim. He said that Dean Shoemaker also shot the victim.** He said that they disposed of evidence by throwing it from the car on the way home and that they burned and hid other items. Foutch said that Dean Shoemaker called the defendant and told her that it was done and that after the defendant and Mrs. Kerr returned, the men told the women that they had not been able to make the death look like an accident. He said that the women were scared and angry. Investigator Winkler

testified that Foutch had backed out of this plea agreement, that he had gone to trial, but that he had entered into another plea agreement before a verdict was rendered in which he pled guilty to second degree murder and received a thirty-five year sentence conditioned upon his agreeing to testify against the defendant and Mrs. Kerr.

Special Agent Robert Daniel Royce, a TBI expert in firearms identification, testified that he had examined six bullets that had been recovered. He determined that three from the victim's body, one from the crime scene, and one from a barn at the Shoemaker residence had all been fired from the same barrel of the same gun. He determined that one bullet might have been fired from the same barrel but that it was too mutilated for him to say so conclusively.

**Dean Shoemaker testified that he was serving a thirty-five year sentence for the murder of Jim Kerr. He said that he and his wife, the defendant, had moved to Tennessee from Florida, and a couple of years later, the Kerrs had moved to Tennessee. He said that Robert Foutch came to live with him and the defendant in January 2002. He testified that he, Foutch, Mrs. Kerr, and the defendant had discussions about killing the victim for money and how they could commit the crime in a way that made his death look accidental. He said that the four of them were together the day before the murder and that Mrs. Kerr said the victim needed to be killed soon. He said the four of them had an argument over how the insurance money would be divided.** He testified that the next day, he and Foutch went to the victim's house, where Foutch struck the victim over the head with a ratchet bar and shot the victim. He said that he checked the victim's pulse and that the victim was dead. He testified that Foutch told him "he wasn't going down for this alone" and put the gun in his hand and fired the gun with him into the victim's body. He said they disposed of evidence on the way home. **He said they called the defendant and told her that Foutch had killed the victim and that the defendant thought he was kidding. He testified that the defendant and Mrs. Kerr got mad because the killing did not look accidental. He said that the defendant told him later that she and Mrs. Kerr had wiped down the truck and tools at the crime scene in order that no fingerprints would be left. He testified that before the killing took place, the defendant had asked Foutch if there was going to be an accident, and Foutch had responded affirmatively. He said that the gun and ratchet bar had been hidden and later retrieved on July 4 when the defendant told him and Foutch that she wanted everything gone. He testified that he, Foutch, and the defendant drove around and disposed of the items as well as some ammunition and the ammunition box.**

On cross-examination, Dean Shoemaker testified that he had suffered a head injury for which he had received a workers' compensation settlement of over $200,000 in Florida. He said that he was not interested in killing the victim when Mrs. Kerr talked about it before they moved to Tennessee because he and the defendant had money

8

from his settlement. He claimed that the victim had been his best friend. He acknowledged, however, that the victim had been mad at him because he tore down a barn on Mrs. Kerr's instruction that the victim had not wanted demolished. He said that Foutch had shown up unannounced in Tennessee and that the defendant initially did not want to take him in. He admitted that his wife had been a good mother to their five daughters. He said that Mrs. Kerr could be demanding and frequently wanted something from him and the defendant. He said that there had been discussion about Mrs. Kerr wanting the victim dead since they had lived in Florida and that he believed even the day before the crime that the talk was a joke. He said that he had legitimate plans to help the victim work on his truck on the day of the murder but that he was not sure whether the defendant and Mrs. Kerr had already planned to go shopping together before the discussion of killing the victim took place the day before the crime. He said that the defendant had said something to Foutch about there being an accident but that he did not think she was talking about the victim being killed. He denied knowing that the defendant had a boyfriend before giving the statement in which he said she had asked Foutch whether there would be an accident on the day of the murder. He did acknowledge, though, that before he gave this statement, he had received a letter from Elvin Pippin which said that the defendant had a boyfriend. **He testified that the defendant had borrowed a gun from Roethlisberger because she did title searches, which required her to have large checks in her possession at times, and worked nights at a market. He said that he did not know that Foutch had the gun on the day of the crime until "it got pulled on [him]." He testified that the defendant told him after the murder that he had nothing to worry about because he was disabled.**

**Robert Franklyn Foutch testified** that he pled guilty to the murder of Jim Kerr and received a thirty-five year sentence. He said that he had known the Shoemakers when they lived in Florida and that he had come to Tennessee in December 2001 under the alias Glen Sanders because he had violated his probation in Florida. He said that he heard Mrs. Kerr say that she would give someone a motor home, a boat, and tools to get rid of the victim. Foutch testified that the defendant and Dean Shoemaker approached him about killing the victim and that it had been discussed three, four, or five times. He said that they told him there was $64,000 in life insurance money, of which Mrs. Kerr would receive half and the three of them would share the other half equally. He **said he had discussed this with the defendant alone on one occasion. He testified that on the day before the murder, the three of them discussed that the killing needed to look accidental. He said the plan was for the defendant to go with Mrs. Kerr to Wal-Mart and for the defendant to call Dean Shoemaker, after which Shoemaker and Foutch would go to the victim's home, and Shoemaker would call the defendant once the killing had been completed. He said the trip to Wal-Mart was devised to establish an alibi for the defendant and Mrs. Kerr. He testified they went to the victim's home with the purpose of seeing whether they could kill the victim. He said they were near the truck when**

**he hit the victim over the back of the head. He said the victim crawled under the truck, and Shoemaker ran around the truck to keep the victim from escaping. Foutch said the victim came out from under the truck, and Foutch shot him three or four times and then Shoemaker shot him once. He said they left the scene and returned to the Shoemakers' home.** On the way, Foutch threw his shoes out of the car. When they got home, Shoemaker burned their clothes and hid the gun in a tree. Foutch hid the ratchet in a culvert. He testified Shoemaker called the defendant, although he could not recall whether Shoemaker told her that the crime had taken place, that she should come home, or both. He said that the defendant and Mrs. Kerr arrived later and that Shoemaker told them what had happened. The women left and went to Bi-Lo. Foutch testified that later in the afternoon, one of the women called Shoemaker to come to the Kerr house. He said that sometime after the murder, "we" disposed of the bullets, ratchet, and gun. Foutch said he went to Florida for three or four weeks and then returned to Tennessee. He said that the defendant picked him up in Dunlap and that she told him he would only receive $5,000 for his part in the crime. Foutch testified that he had received various plea offers from the state before accepting the thirty-five-year sentence for his guilty plea to second degree murder. He said that the defendant had been a good mother while he was living in the Shoemaker home. He acknowledged that the victim had been mad at him about the barn that was torn down, but he professed that he did not care because Mrs. Kerr wanted the barn torn down and the property was hers. He said that when he first began living with the Shoemakers and he heard conversations about killing the victim for insurance money, he thought the comments were made in jest. Foutch admitted that he and Mrs. Kerr had spent the night alone together a few times, but he denied that he was closer to her than he was to the Shoemakers. He said that he did not recall a specific time when Mrs. Kerr asked him to kill the victim.

Terry Maberry testified that he was a bail bondsman who had made a $25,000 bond for the defendant. He said that the defendant did not appear in court for her trial on November 16, 2005. He later learned that she was in a county facility in Edenberg, Texas, and went there to get her. He testified that Edenberg was ten or fifteen miles from the Mexico border. He said that his investigation revealed that the defendant had been to Mexico and was apprehended as she crossed the border back into the United States. He said that the defendant had appeared as scheduled at all prior hearings and that she had made the required payments on her bond.

**The defendant testified that she was married to Dean Shoemaker. She said that they had moved to Tennessee from Florida in January 1999. She testified that before their move, Dean Shoemaker had been badly injured and received a settlement of $218,000. She said that at first, Shoemaker could not bathe or dress himself and could not remember things. She said that he gradually improved, although he never recovered to the point he could go back to work. She said that Shoemaker and their daughters received over $900 a month in**

**Social Security benefits.**

**The defendant testified that before the Shoemakers' move to Tennessee, Mrs. Kerr had begun saying she no longer wanted to be with the victim and expressing her wishes that he would have an accident or that someone would kill him. The defendant said that Mrs. Kerr continued saying these things after Mrs. Kerr moved to Tennessee.** The defendant said that Mrs. Kerr was upset because the victim was trying to gain custody of his son, and Mrs. Kerr said that she had already raised the defendant. **The defendant testified there were discussions of how the victim might be killed in which she, Dean Shoemaker, and Robert Foutch made suggestions. The defendant said she never took any of these conversations seriously. She said that the statement Investigator Winkler read to the jury was misleading because the conversations that were recounted in it took place over a period of time, and the statement gave the false impression that "it looks like that all happened in one night, and it didn't." She said that when she was arrested, she insisted that Winkler add to the statement that she thought nothing would happen because she never took the discussions seriously.**

The defendant testified that on the day before the victim was killed, Mrs. Kerr said something about wanting the victim killed. The defendant left her home to do a title search, and Dean Shoemaker and Foutch were working on cars. She said she did not know what was discussed while she was gone. According to the defendant, Shoemaker, Foutch, Mrs. Kerr, and she were sitting in the garage later that night when the subject came up again. She said the others started talking about how the murder could be done, and the defendant told them she did not want to hear any more about it and went inside. She said that about ten minutes later, Shoemaker entered and told her not to worry because they were not serious.

The defendant testified that a week or two before the victim was killed, she and Mrs. Kerr had planned a trip to Wal-Mart in Lafayette. She said that the trip to Wal-Mart was not related to the killing. She said that Shoemaker had planned to help the victim work on his truck on the day of the crime. The defendant testified that she, Mrs. Kerr, and the defendant's children went to McDonald's in Lafayette and were finishing lunch when she received a call from Shoemaker. She said that Shoemaker inquired whether they were about finished and told her to hurry. She said that she called Shoemaker from Wal-Mart to ask whether she should buy cat food and that he told her again to hurry. She said Shoemaker told her there was a problem that he would tell her about when she got home. She testified that when she returned home, Shoemaker told her something, which she did not specify, and that she thought he was joking. The defendant testified that after this, she left her children at her home and that she and her mother went to buy sweet acidophilus milk because that was the only kind of milk that the victim drank. She said that she began to think something might have happened but that until she went to her mother's house, she did not

11

believe either Shoemaker or Foutch was capable of killing anyone. The defendant testified that Shoemaker told her several different stories about what had happened and that she was never sure what to believe. She said she "really freaked out" when Shoemaker had been involved because she did not want her children's father to go to jail. She said that she and Shoemaker knew they "needed to get rid of the weapons before the kids came back home." At some point, she, Shoemaker, and Foutch went to dispose of the gun and the ratchet by throwing them out of the car. She said that she had been injured when Foutch tossed the gun from the car and it hit her in the back of the head.

The defendant testified that Mrs. Kerr had told her before the victim's death that the victim's life was insured for "thirty-some-odd thousand" dollars, and on another occasion, that the insurance was for sixty thousand dollars. **The defendant said she did not do anything to aid in the commission of the crime and that she did not know it was going to take place. She denied that she asked Foutch before she left the house on June 29 whether an accident was going to happen**.

The defendant testified that she had been in jail two days shy of a year before she was able to make bond. She said that she took her children to visit Dean Shoemaker in jail and that he told her to move on with her life and to find someone to take care of the children and her. She said that she had come to court for various appearances but that she had not come to court on the day her case was set for trial. The defendant testified that she had received information from her boyfriend that the Masons had a contract on her life to avenge the death of the victim, who was a Mason.

The defendant testified that she graduated from paralegal training with a 3.9 grade point average. She said that she had given inaccurate information to the authorities but that the statement she gave on September 3 was truthful. She acknowledged that in a statement she gave after she was arrested, she had said that she had been present for discussions of killing the victim and on one occasion had suggested that his car be run off the road. She testified that many other things in the post-arrest statement had been taken out of context, although she admitted she had signed the statement.

Shoemaker, 2006 WL 3095446, at **1-9 (emphasis added). The other facts relevant to petitioner's claims are set forth in the analysis of the particular claim.

## C. Conclusions of Law

Petitioner's habeas petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the

AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings, as opposed to dicta" of its decisions "as of the time of the relevant state-court decision." Id. at 412.

In Greene v. Fisher, 565 U.S._, 132 S. Ct. 38, 42, 2011 WL 5335411, at *2 (2011), the Supreme Court considered whether "'clearly established Federal law' includes decisions of this Court that are announced after the last adjudications of the merits in state court but before the defendant's conviction becomes final" and answered the question in the affirmative. There, a Supreme Court decision at issue was rendered two months after the state supreme court upheld the petitioner's convictions. Id. The Supreme Court held that its decision was not clearly established at the time of the state supreme court's decision. Id. at *3-5. The Supreme Court noted a different result if the Petitioner had applied for the writ of certiorari or had filed a state postconviction

13

petition. Id. at *5.

In Bell v. Cone, 535 U.S. 685, 693 (2002), the Supreme Court reiterated that the AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law." Under the "unreasonable application" clause, a state court judgment results in an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the Supreme] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. The Supreme Court explained that a state court's application of clearly established federal law must be "objectively unreasonable," and a federal habeas court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 694. A state court's application of federal law is unreasonable and habeas relief may be granted if the "state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." Herbert v. Billy, 160 F.3d 1131, 1135 (6th Cir. 1998) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996)).

In reaching this decision, the Supreme Court reiterated that the claims were to be decided on the record before the state court:

> **In this and related contexts we have made clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it.** See Yarborough v. Gentry, 540 U.S. 1, 6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) 124 S.Ct., at 4 (denying relief where state court's application of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); cf. Bell v. Cone, 535 U.S. 685, 697, n. 4, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary

14

to federal law).

Holland v. Jackson, 542 U.S. 649, 652 (2004) (emphasis added). The district court also "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 738 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes credibility findings of the state courts. Skaggs v. Parker, 235 F.3d 261, 266 (6th Cir. 2001).

### 1. Denial of Right to Present a Defense Claim

This claim involves the trial court's exclusion of certain evidence that Petitioner sought to elicit at trial. On Petitioner's post conviction appeal, the Tennessee appellate court described this claim as follows: "The defendant argues on appeal that the trial court denied her the opportunity to present a defense when it ruled that the defendant could not cross-examine Jessica Roethlisberger about evidence of a threat on the defendant's life to show the defendant's fearful state of mind when she fled to Mexico. She claims that she should have been allowed to offer Roethlisberger's cross-examination testimony to corroborate her own testimony about the reason for her flight. The state argues that the exclusion of this evidence was not an abuse of discretion. We agree with the state." Shoemaker, 2006 WL 3095446, at * 9.

In sum, the Tennessee Court of Criminal Appeals affirmed the trial court's ruling that the cited statements were inadmissible hearsay under Tenn. R. Evid. 801© and that Petitioner's right to present a defense was not violated as Petitioner testified in her defense about this threat. As corroborative of her trial testimony, the state court observed that when defense attempted to introduce this evidence of a threat to Petitioner's life, "[t]here was no evidence to corroborate at that

15

stage in the proceedings." <u>Shoemaker</u>, 2006 WL 3095446, at 9-11. Applying state and federal law,

the state appellate court reasoned as follows:

> Jessica Roethlisberger testified for the state during its case-in-chief. On cross-examination, the defendant attempted to ask the witness about her knowledge of a Masonic contract on the defendant's life, but the state objected. The trial court held a hearing outside the presence of the jury. In that hearing, Jessica Roethlisberger testified that she was visiting the defendant one day when the defendant's boyfriend told Roethlisberger that the Masons had a contract on the defendant's life. The witness could not recall the defendant's boyfriend's name. The defense sought to introduce this proof to show why the defendant fled before her earlier trial date. The court ruled that the evidence was inadmissible hearsay.

> Later, the defendant testified that she had not appeared at an earlier setting of her case for trial because she was scared. She then sought to testify about the reason she was scared. In a jury-out hearing, the defendant testified, "I was told that the Masons had a contract out on me and they wanted to kill me.... I was told this in August, and they said, well-I was told that no matter what happened at my trial, I would not make it out of the courtroom." She attributed this information to her boyfriend, Norman Lever. The trial court overruled the state's objection to admission of the evidence and found that it was proper under the state of mind exception to the hearsay rule. Thereafter, the defendant testified in front of the jury, "[My boyfriend] told me that the Masons put out a contract killing for me because of what happened to Jim [the victim], and he told me that he was told that Jim was a Mason also." The trial court instructed the jury that the evidence should not be considered for its truth but that it was evidence to be considered on the issue of the defendant's state of mind and the effect the words had on her. After this evidence was admitted, the defendant made no effort to recall Jessica Roethlisberger to corroborate the defendant's testimony.

> The defendant claims on appeal that this evidence was not hearsay and that the trial court denied her the opportunity to present a defense by excluding it. The issue is one which requires analysis of both the Rules of Evidence and the Constitution.

> We consider first the impact of the Rules of Evidence. The trial court found that Roethlisberger's proffered testimony that the defendant's boyfriend said that the Masons had a contract on the defendant's life was hearsay. <u>See</u> Tenn. R. Evid. 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted."). Although the defendant's proffered use of this testimony was to show its effect on the defendant, the defense did not elicit testimony from Roethlisberger during its offer of proof that the defendant was present when her boyfriend made the statement to Roethlisberger. <u>See</u> Tenn. R. Evid. 803(3) (state of mind hearsay exception). Without

proof that the statement was made to Roethlisberger in the defendant's presence, there was no proof of any effect a statement had on her state of mind such that the trial court should have allowed the defendant to cross-examine Roethlisberger about the statement. We hold that the trial court did not abuse its discretion in excluding this evidence on the basis of the hearsay rules.

Having determined that the evidence was inadmissible hearsay, we turn to the constitutional aspects of the inquiry. The "Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." State v. Brown, 29 S.W.3d 427, 432 (Tenn.2000); see Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). In appropriate cases, this right surpasses the hearsay rules. See State v. Brown, 29 S.W.3d 427, 433 (Tenn.2000) (relying on Chambers ). However, in many other situations, the defendant's due process right "must yield to other legitimate interests in the criminal trial process," including "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Brown, 29 S.W.3d at 432 (quoting Chambers, 410 U.S. at 295, 302, 93 S.Ct. at 1046, 1049). Our state supreme court has recently said

> The facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important. See Chambers, 410 U.S. at 298-301, 93 S.Ct. at 1047-49.

Brown, 29 S.W.3d at 433-34.

In the present case, the evidence was not critical to the defense. The defendant testified during her case-in-chief about the alleged threat and its effect on her. Although the defense claims it should have been allowed to corroborate the defendant's testimony with that of Roethlisberger, the defendant had not testified at the time the defense attempted to introduce the evidence through Roethlisberger. There was no evidence to corroborate at that stage in the proceedings. The exclusion of the evidence did not have the effect of denying the defendant the opportunity to present pivotal otherwise unknown information to the jury. The interest in excluding unreliable and inaccurate hearsay testimony is an important one. See generally Neil P. Cohen et al., Tennessee Law of Evidence § 8.01[3][a] (5th ed.2005). Application of the Rules of Evidence did not deprive the defendant of due process. The trial court did not deny the defendant the opportunity to present evidence of her fear. It only

limited the means by which she could offer that proof. Given these facts, we hold that the trial court did not infringe upon the defendant's due process right to present a defense.

Shoemaker, 2006 WL 3095446, at *9-10.

An issue concerning admissibility of evidence does not rise to a level of constitutional magnitude unless it can be viewed as so egregious that petitioner was denied a fundamentally fair trial. See Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir. 1988). To warrant habeas relief, the excluded evidence must be critical, that is, the evidence must "tend to exculpate" the petitioner and also must contain "persuasive assurances of trustworthiness." Turpin v. Kassulke, 26 F.3d 1392, 1396 (6th Cir. 1994). Otherwise, a question of purely state law rarely serves as a basis for habeas corpus relief. Estelle v. McGuire, 502 U.S. 62 (1991). As the Supreme Court stated, "[t]oday, we reemphasize that it is not the province of a federal habeas court to reexamine state court determinations on state law questions."Id. at 67-68. To be sure Chambers v. Mississippi, 410 U.S. 284, 302 (1973) held that the right "of an accused to present witnesses in his own defense." is "fundamental".

As applied here, the state courts ruled that Roethlisbergher's proffered testimony was hearsay because she would be referring to the statement of another person and that Petitioner was not present when the purported statement was made.

> MR. SADLER: Ms. Roethlisberger, were you present when someone advised [petitioner] that there was a contract on her life?
>
> THE WITNESS: I don't know when it was first told to her, but when I was up visiting one day when I happened to be in Livington and I stopped over, it was discussed, and her boyfriend at that time told me about it and said that he was—said that the Masons had a contract out.

(Docket Entry No. 23-4, Addendum 1, Volume IV, p. 116).

As to Petitioner's testimony about the effect of the threat upon her state of mind and her flight to Mexico, the state appellate court reasoned that at the time of's testimony as a state witness, there was not any evidence for Roethlisberger to corroborate. Thus, the Tennessee courts could also reasonably find that this alleged statement to Roethlisberger was not in Petitioner's presence so as to have any effect on Petitioner's state of mind. Shoemaker, 2006 WL 3095446, at *10. Petitioner has not shown, as the state court found, that Petitioner was precluded from calling Roethlisberger as part of her proof at trial after petitioner testified about a threat. (Docket Entry No. 23-8, Addendum 1, Volume VIII, p. 13; Docket Entry No. 23-4, Addendum 1, Volume IV, p. 9). In these circumstances, this Court concludes that the state courts' ruling on this claim are reasonable applications of state and federal law.

## 2. The Ineffective Assistance of Counsel Claim

For this claim, Petitioner cites her counsel's failures to challenge the admission of her fourth statement to the law enforcement officer and to communicate and/or advise her on the State's plea offer. In her state post-conviction appeal, Petitioner's claim was that "counsel was ineffective in that counsel failed to communicate openly and honestly with her and failed to properly investigate and appeal the Constitutionality of her final statement to the police." Shoemaker, 2010 WL 1462527, at *4. The Tennessee appellate court rejected these claims.

> On appeal, Petitioner argues that the post-conviction court erred in denying her petition because counsel was ineffective in that counsel failed to communicate openly and honestly with her and failed to properly investigate and appeal the Constitutionality of her final statement to police.
>
> The next witness at the hearing was Petitioner's counsel at trial. Trial counsel stated that he and Petitioner discussed whether to ask for a change of venue, but Petitioner did not want to move the trial. **Trial counsel stated that he did not believe that the alleged threats on Petitioner's life were that important to her defense. However her leaving her children**

**and running off to Mexico with a boyfriend, as opposed to staying close to her husband who was set to be a witness at her trial were damaging to her defense**. Trial counsel stated that he wanted Petitioner to stay close to her husband because he was slated to testify. Trial counsel was hoping that Petitioner's husband would have some sympathy for her and maybe refuse to testify. Throughout his representation of Petitioner, she maintained that she did not know anything about the planning of the murder. Petitioner maintained that there had been some joking, but she did not know that the murder was really going to occur.

**Trial counsel confirmed that the State did make an offer for a plea with a sentence of fifteen years. According to trial counsel, Petitioner did not want to take the offer. Trial counsel said that he would have been very comfortable with her accepting the offer. Petitioner maintained that she was innocent. Trial counsel stated that he was shocked with the amount of information the State turned over during discovery. The State had an open file policy. After a hearing on the motion to suppress had been held, the State turned over a tape recording to trial counsel. In the recording, Petitioner said something like "Mother, they got us; they know about it."** Trial counsel immediately presented the recording to Petitioner and told her that they should file a motion for a continuance. Petitioner refused to agree to a continuance. She said that she wanted to have the trial over.

**Trial counsel refuted assertions that he had told Petitioner that her case would be "a piece of cake." He did tell her immediately before trial that he and Petitioner should walk into the courtroom with an air of confidence that she was innocent**. Trial counsel testified that he went through the evidence with Petitioner and informed her honestly about his thoughts about the case. He visited with her often while she was in jail. While Petitioner was out on bond, she visited his office.

Trial counsel stated that he engaged a second attorney, appellate counsel, to work with him on part of the case so that appellate counsel would be fully prepared to take up the appeal if need be. Trial counsel thought very highly of appellate counsel's appellate skills.

Appellate counsel also testified at the hearing. He began to help about two months before the trial. Appellate counsel did not think a change of venue would have been appropriate. He did not remember much publicity about the case in either newspapers or television. Appellate counsel stated that he chose which issues from the motion for new trial to bring on appeal by relying upon his philosophy that he did not want to focus on issues that would not really change the outcome in light of her life sentence. He wanted to get her first degree murder conviction overturned in order to get a new trial.

Appellate counsel stated that he did not raise an issue concerning the constitutionality of her final statement to law enforcement because it would basically have been Petitioner's word versus Agent Winkler's word. He knew that the argument had not worked in the suppression hearing and believed that it would not have worked on appeal. Appellate counsel testified that he went over his appellate strategy with Petitioner. He told her that his intention was to get her conviction overturned. Petitioner did not ask appellate counsel to include more issues, she left it up to his discretion.

**Petitioner was the final witness at the hearing. She stated at the outset of her testimony that she did not have any confidence in trial counsel. However, on cross-examination she stated that she did have confidence in him.** Petitioner also stated that trial counsel led her to believe that he was confident in the defense strategy. The night before trial, trial and appellate counsel asked her how she was feeling. Petitioner stated that she said she was sure of getting an acquittal. Petitioner also testified that trial counsel told her that the tape recording was not "that big of a deal" and that she should not worry about it.

**Petitioner stated that trial counsel presented the fifteen-year offer to her. Petitioner maintained that she considered the offer, but trial counsel told her she should take the case to trial.** Petitioner also stated that she wanted the case moved to another venue because the trial was "plastered all over the front page of the newspaper several times." She testified there had been threats on her life and she discussed these with trial and appellate counsel. She told them they could contact her doctor or her daughter's counselor to corroborate the threats. On cross-examination, she admitted that the doctor had heard the information from her. Petitioner complained that she was not allowed to have any input into the motion for new trial or her appeal. She denied that appellate counsel spoke with her in person about the appeal. She stated that he told her on the telephone what the issues would be. According to Petitioner, she asked him if there should be more issues, but he said no.

Shoemaker, 2010 WL 1462527 at ** 2,3.

In ruling on the merits of this claim, the Tennessee appellate court deemed the issue to be one

of credibility and adopted the state trial court's credibility determination:

> With regard to Petitioner's allegations that counsel failed to communicate with her honestly regarding her plea offer and her chances of being convicted, **the post-conviction court stated that trial counsel had met with her numerous times both while she was out on bond and in jail; had informed her of the offer from the State; and discussed the evidence with her. We find no evidence that preponderates against the post-conviction court's findings. Basically, the issue**

21

**comes down to a credibility determination between trial counsel's testimony at the hearing and Petitioner's testimony at the hearing. It is clear that the post-conviction court found trial counsel's testimony credible.** "[Q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact," and the post-conviction court's credibility determinations are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn.1996). We find no evidence to preponderate against the findings of the trial court. Therefore, Petitioner has not proven that the services rendered by trial counsel were deficient with regard to this issue.

Ineffective Appellate Counsel

        *               *             *

**Petitioner has failed to include the transcript of the hearing on the motion to suppress in the record. We have also reviewed the record in Petitioner's direct appeal. However, the record on direct appeal does not contain a transcript of the hearing on the motion to suppress. For this reason, we are unable to determine the merits of whether the trial court should not have denied the motion to suppress.** As stated above, to prevail on a claim that appellate counsel was ineffective, we must determine the merits of the issue that appellate counsel failed to present on direct appeal. **In this case, we are unable to determine the merits of this issue. Therefore, Petitioner is unable to prove both prongs that appellate counsel acted unreasonably in failing to raise the issue and that Petitioner would have been successful on direct appeal based upon this issue.**

Shoemaker, 2010 WL 1462527, at *4-6 (emphasis added).

Under the governing law, this Court "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." Mitchell, 325 F.3d at 738 (6th Cir. 2003) and this presumption includes the state courts' credibility findings. Skaggs, 235 F.3d at 266. Upon review, this Court concludes that the state courts reasonably applied Strickland and reasonably concluded that Petitioner failed to demonstrate ineffectiveness of her trial and appellate counsel based upon the evidence before those courts.

Petitioner's final claim is that her counsel did not communicate the State's plea offer to her. This claim was decided by the state courts' findings on credibility and the state courts credited Petitioner's trial counsel that he in fact communicated the State's plea offer of 15 years and that Petitioner rejected the offer. For this claim, Petitioner also cites the two Supreme Court decisions on claims for ineffective assistance of counsel, <u>Missouri v. Frye</u>, _ U.S. _, 132 S. Ct. 1399 (2012) and <u>Lafler v. Cooper</u>, _ U.S. _, 132 S. Ct. 1376 (2012), but the Sixth Circuit has held those decisions are not retroactive. <u>In re Liddell</u>, 722 F.3d 737, 738-39 (6th Cir. 2013). Although <u>Liddell</u> involved an action under 28 U.S.C. § 2255 that does not contain a requirement of a clearly established right, the Sixth Circuit in <u>Liddell</u> cited for its ruling <u>In re Green</u>, 144 F.3d 384, 388 (6th Cir.1998). <u>Green</u> applied <u>Teague v. Lane</u>, 489 U.S. 288, 305–10 (1989), a ruling in a Section 2254 action. In a word, even without the clearly established law requirement, <u>Liddell</u> holds that the <u>Teague</u> doctrine bars any relief on this type of claim.

For the reasons stated, the Court concludes that Petitioner's petition for writ of habeas corpus should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the 31st day of March, 2014.

William J. Haynes, Jr.
Chief Judge
United States District Court